Case number 417-0415, Michael McGue v. Board of Trustees of the Teachers Retirement System. For the appellant, we have Mr. Nichelle. And is that how you pronounce your last name? It's pronounced Nic-uh-lee. Nic-uh-lee, okay, thank you. And then for the appellee, we have Ms. Quinn. Mr. Nic-uh-lee, you may proceed. Thank you, Your Honor. Please declare, counsel. 14 years. 1999, Mr. McGue, Michael McGue, became the local coordinator for the Lake County Federation of Teachers. And for 14 years after that time, he paid contributions to the teacher retirement system. For 14 years, TRS accepted those contributions. For 14 years, TRS sent yearly audit statements and presumably invested that money and gained from that. For 14 years, during that entire period, Mr. McGue did not receive one objection, one notice, nothing, that his service credit for his job as a local coordinator would not be counted for TRS. Did any of those notices include disclaimer language? There was disclaimer language on some of the notices that that was an estimate. And particularly after he made the decision to retire in the winter of 2013, he received a customized estimate benefit form that laid out his benefits. Again, there was no indication at that time that his 14 years of service was going to be discounted. There was a disclaimer that said this was an estimate. However, as Mr. McGue testified at his deposition, which was attached to the motion for summary judgment, and this is a reasonable position to take, while there's a disclaimer that this may be an estimate, and there might be variations here and there, some math that's not correct, a reasonable person wouldn't take that estimate to say that 14 years of service credit would be discounted. So while there might be a disclaimer, Your Honor, that says that this is an estimate only, an estimate means there might be fluctuations a little bit one way or another. It doesn't mean that 14 years is going to be discounted. And certainly nobody could expect that just because there's a boilerplate disclaimer that's included in the forms, that 14 years of contributions and 14 years of service credit would be wiped out. Now what about when he made the transition to the local 504 coordinator? Yes. There was some conversation between him and, refresh my memory, it's the organization that was the pass-through. That's IFT, right? Yes, Your Honor. There was some conversation between him and a gentleman from the pass-through organization about, well, you can still possibly do a retirement or pay into the pension for such and such. What was that conversation? Do you know what I'm talking about? I do, Your Honor. And that was Glenn Smith, who was the IFT, the field coordinator. And as part of creating this position, the AFT, the American Federation of Teachers, which is the national, the IFT, which is the state, they came up with the idea of creating this position for Lake County. And so as part of that discussion, it was decided that Mr. McGue would be employed by the IFT because the local didn't have the ability at that time to provide benefits. It just wasn't set up that way. Now you say employed by the IFT. Was that their discussion? Because I got the impression that this was a pass-through, that he didn't work for them. No. It's our argument and our stringent belief that he was employed by the IFT. And I can explain, if Your Honors wish me to do so, why I believe that. Well, I realize you've taken that position and some others in your briefs. Sure. But I'm just asking, was that the language used between the parties? That's what I mean when I'm asking you. Did they say, we're going to have you come work for us? Was that the nature of their conversation? It was not the nature of the conversation. And I think that kind of gets to the heart of the matter here, to some extent, is that the statute that's at issue, Section 106.8 of the Pension Code, the regulations don't really take into consideration as to how these unions operate and how they work. This is one big happy family, so to speak. And so to say that there's cookie-cutter designations, local, state, national, there just simply isn't those cookie-cutter designations because it's all working towards the same goal. It's all working towards the common goals of the AFT, the IFT, and the local. And so when we're talking about they set up the AFT and the IFT set up this position, it was set up to benefit everybody. And so that's the nature of the hierarchy. It's all steps in the ladder. The local, the IFT, and the AFT, but it's all one ladder, so to speak. And they're all working together towards that. Now, Mr. McGue, in being employed by the IFT, he received his paycheck from the IFT. He received a W-2 from the IFT. He took direction from the IFT, particularly into where to organize the districts. The IFT would go to him and say, you need to organize a district at a certain location, and he had to do that. He had to have his time approved, his expenses approved from the IFT. He had to have his vacation approved from the IFT. He had to keep them apprised of his arbitrations and his negotiations. Certainly, his superiors, Dave Richmond's from the IFT and Ray Mackey from the AFT, considered him to be an IFT employee. The president of the IFT told Mr. McGue to do something. He had to do it. And so... Now, when you say that he was paid by them, didn't they pay a portion of it and they were reimbursed by the local? Well, it started off as a three-year agreement where the AFT paid a portion. They paid 50%. The IFT paid 25%. Well, excuse me, it was 75%, 25%, 0%, and then it phased out. But the IFT always paid something. They were reimbursed, but the IFT then also supported this program through grants going forward after that. And the IFT also, it was necessary for the IFT to interview Mr. McGue in deciding to hire him for this position. And the IFT also had veto power over the decision to hire Mr. McGue or anybody else. And so... The decision of Local 504 to hire him. Well, but if they had veto power, then they had the ultimate say. Because the Steering Committee, while they were also involved in the process, and they could also have involvement in the decision, if IFT had the veto power, then the ultimate decision rested on the IFT. And while there was some testimony or some documents that only in severe circumstances would I exercise this veto, it doesn't change the fact that with veto power, they had the ultimate say on who was going to be the local coordinator position. Mr. McGue devoted a significant amount of his time towards IFT goals. Almost 20% of his time, or excuse me, 20 hours of his time of the week, as reflected in some of the documents in the record, was devoted towards issues of specific interest to the IFT. And there was some case law cited by the TRS regarding the funding of this position. That case law, in these circumstances, is distinguishable. And I'm talking specifically about the Falauto v. TRS case. In that instance, there was a music teacher who was hired by a private entity who then went to work for the school. And there was some arguments in that case that, well, first off, I think the circumstances are completely different. In that case, the music teacher basically conceded that he wasn't entitled to service credit and he wanted the public court to bend the rules for him. I think that's what the case said. But in regard to the funding sources, in that case, he was still paid by that private entity. Even though the school district may have paid the private entity, he was still paid by the private entity. Here, Mr. McHugh was paid by the IFT, the exact organization that he was employed by. So in that case, the argument was, well, even though I was paid by the private entity, the school district paid the funds, and therefore, I should receive my TRS. That's not the case here. And that was a similar case in regard to the case of N. Ray Signig-Oakley, although that matter doesn't have precedent over this court because it was just a board decision. But it was the same type of scenario. So for those reasons, Mr. McHugh's time was devoted significantly to the IFT, funded by the IFT partially, paid by the IFT. He had to take direction for the IFT. And so he was an employee of the IFT. And taking it a step further, I think the difficulty here, as I alluded to before, is the fact that there's a, I guess for lack of a better term, a blurring of the lines here as to the duties of the local, state, and federal. Because they're all, as I said before, it's all part of the same hierarchy. And this situation provides a perfect example for that, where we have shared funding for the position. We have overlapping duties regarding the IFT duties and any local duties. And there's significant overlap in that. We have, now the board relied on the constitutions to reject this argument that they are one, they're not one organization, so to speak. Not one big happy family. And they relied on the constitutions. But then they went outside the record to support their decision. And I don't think this is insignificant. Because while they mentioned and quoted, or they cited to the constitutions of these organizations, in regard to the website that the board went outside the record to view, they had significant block quotes. They certainly didn't block quote anything from the constitutions. But in regard to going outside the record, they were block quoting the websites. And if it was so clear cut that the constitutions established that these aren't one organizations working together, why was it necessary for the board to then go outside the record and cite significant block quotes to support their decision in rejecting that argument? This would be akin to a jury trial and a juror in a jury box googling information and then basing his or her decision on that. Was much of that information from the website also contained in the constitutions and the bylaws? I don't believe so, Your Honor. It was information that was not cited in the record. Was it in the constitution and the bylaws? Well, there was information about the way that they were set up. But there was also information that was in that website that was not in those constitutions. And again, if it was in the constitutions, why was it necessary then for the board to go out to the websites to support their decision? And in regard to the argument that the board is entitled to take judicial notice, they would under proper circumstances. As Mr. McHugh was entitled to notice that the board was going to do that, and also in regard to some of the case law cited by TRS in their brief, and I'm speaking specifically about the Innovative Garage case and the People v. Clark case, Innovative Garage involved sufficient contacts for a personal jurisdiction issue, and they took judicial notice of the website. They didn't take judicial notice of the actual facts in the website, as the board did. Further, People v. Clark, cited by TRS, dealt with internet maps, which the appellate court has decided has some reliability. And in that instance, they only took judicial notice of a parking question in context of witness statements. So in going outside the record to support their decision in this regard, the board acted improperly and ultimately denied Mr. McHugh his right to due process. Now, also a difficulty in this case is that the statute at issue, and I'm talking about 16-106-8, is vague. And we believe it's unconstitutionally vague. The board identifies what TRS historically considered to be statewide teacher organizations. But there's nothing in the record prior to the board making that statement to suggest what the board historically considers to be statewide teacher organizations. There's no statutes, there's no regulations, there's nothing to put anybody on notice that only the IFT and the IEA, the Illinois Education Association, are considered statewide teacher organizations by TRS. And when we asked the various witnesses at depositions regarding the TRS definition, they weren't able to provide us with any place this was written down. And if the legislature decided that only the IFT and the IAE were statewide teacher organizations, then why isn't that in the statute? And so there's no criteria to guide TRS. There's no standards or guidelines or anything regarding what specifically a statewide teacher organization looks like. Someone can work for the IFT, and they can be an IFT employee, but only located to two counties. But then someone could be employed by the Lake County Federation of Teachers and go throughout the state, but they still wouldn't be considered a statewide teacher union? Well, is it reasonable to conclude that you're only a statewide organization if you're working for individuals statewide? And by that I mean you're an organization that impacts employees statewide, not that you travel statewide. That is a reasonable interpretation, obviously, but I could also make the argument that in performing his duties as the local coordinator for the Lake County Federation of Teachers, he was affecting statewide employees. And so under that definition, he was traveling out of state, he was doing duties specifically mandated by the IFT and working towards that common goal. And so I think that's where the, again, this goes to the difficulties of the statute and the regulations in that we're talking about distinctions here that it doesn't take into account how these unions operate. Counsel, I don't understand the context of your argument that the statute is unconstitutionally vague. If we were to agree with you, what would be the effect of that? Well, the statute would have to be declared void, Your Honor. Well, then what's left of your case? Well, I understand your point, Your Honor. Well, to make it more clear, perhaps, we see this argument with some frequency. It's not all that unusual. It's a constitutional argument, so it doesn't prevail all that often, but sometimes it does. But the context of the argument is, here's a statute that is oppressing me in some fashion, criminal or civil, and it shouldn't be permitted to be enforced because it's unconstitutionally vague. And if we agree, then say, okay, this criminal statute can't work anymore. We're not going to let it have its effect. But here, I'm not sure how this follows. It seems to me, if we agreed with you that the statute is unconstitutionally vague, that it doesn't advance your client's position at all? Well, and I guess the crux of the argument, Your Honor, is that the way the interpretation here doesn't allow Mr. McHugh or the IFT, there's several reasonable interpretations here. And to say that one is a statewide organization and one isn't based on that. Well, you can argue, obviously, you are arguing how the statute should be interpreted. Right. It should be interpreted more broadly, whatever. Right. You argue it's unconstitutionally vague. And I can't see, if we were to agree with that, how it helps your case at all. Indeed, maybe, since this is the statute you're relying on, if it's unconstitutionally vague and of no effect, then it seems to me you lose. Well, but at this point, Mr. McHugh doesn't have a pension based on TRD. Well, you lose this appeal. Yeah. Aren't you relying on that statute as the basis for us to reverse what happened here? Well, the statute, the only reason we're relying on the statute is because that's the statute that was used to deny Mr. McHugh his pension benefit, the 14 years of credit service. Okay. You know, that's the reason that's involved here. But taking it to another point, well, not taking it to another point, but I guess the other part of this, Your Honor, is that for 14 years Mr. McHugh was making contributions here. Nobody said anything. And so there is an injustice to this in that Mr. McHugh, for 14 years, without anybody raising an objection, saying boo about this contributions, they accepted the contributions, and then Mr. McHugh goes to retire. They provide him his customized benefit form. And then after he receives that, he's forced to retire in March of 2013. And then I'll fast forward all the way to August of 2013. He's told, oh, sorry, you can't participate. And I see my time is up, Your Honor. So thank you. Thank you. You will have additional time on rebuttal.  Ms. Quinn. Good morning. May it please the Court. The Board had originally intended to come and argue that this case is. . . Ms. Quinn, I'm going to ask you to speak up just a little bit. That microphone does not amplify. It simply helps us hopefully get a good recording. I apologize, Your Honor. I always make that mistake, and I lean toward it. Thank you. So the Board had originally intended to argue that this is a case study in unwarranted assumptions and a failure to check on pension eligibility. And that may be true of Mr. McGue himself. But on reviewing the record, there's one document in particular that jumped out. Glenn Smith, who was Director of Field Operations for the Illinois Federation of Teachers, was one of the architects of the Lake County Federation of Teachers Coordinator position. And he was also the architect of the Administrative Agency Agreement, the so-called pass-through scheme or agreement, by which Mr. McGue's salary and benefits were paid. And in February of 1999, he wrote an email to the Lake County Federation of Teachers Steering Committee saying, I know you're about to select somebody who's going to occupy this role, and here's what we're going to do for you. And that's where he set out the Administrative Agency Agreement. He announced that the IFT would act as the agent, issuing paychecks and dispersing benefits. And he declared that it was essential that the program be structured in that way. And he explained why. And I apologize for quoting, but this really is worth a quote, and it's page C197 of the record. The most likely prospects for the position will come from within the LCFT. Administration of the program through the IFT will also guarantee continuation of the employee in their current state pension plan. The avenue to this type of benefit cannot be duplicated by the Lake County Federation of Teachers. In reality, the program offerings in insurance and pension benefits are probably the most attractive part of the overall plan. There is simply no other way to achieve them. The board submits that Glenn Smith knew full well that whoever held the position of Lake County Federation of Teachers coordinator would not be eligible for a state pension. And it appears that this pass-through agreement was crafted to get around that inconvenient fact. After all, a state pension, particularly a Tier 1, which this is, is quite attractive. And the fact that the Illinois Federation of Teachers was fronting McHugh's salary and benefits and getting reimbursed on the back end had the effect of misleading TRS for 14 years. Because all TRS could see was that these contributions were coming in under the Illinois Federation of Teachers employer name, under the Illinois Federation of Teachers unique employer number. Why would TRS ever think to question that? The fact is, TRS was completely blind to the pass-through arrangement. And it had no reason to question whether Mr. McHugh's pension contributions were properly being submitted until he applied to retire and it conducted the audit that it conducts when anyone in the system retires. And they tried to match up the salary with his various positions because he had two elected positions as well as his paid job. And it found there were inconsistencies in questions that people couldn't answer. And because this pass-through scheme had the effect of misleading TRS for the 14 years, it's kind of ironic to have the doctrine of equitable estoppel invoked in the briefs. TRS was not trying to hide anything from anybody. Instead, material information was being concealed from TRS. So, estoppel should be rejected for this reason as well as for all the other reasons set forth in the board's brief. It is also plain that the three labor organizations are not one and the same. The record establishes that the American Federation of Teachers, the Illinois Federation of Teachers, and the Lake County Federation of Teachers all have their own constitutions, their own bylaws. Each can sue and be sued. Each can acquire property. Each can enter into agreements. And each, I may have said this already, has its own governing board. And that is in the record. There is unrebutted testimony in the record that although the local organizations are offered a generous amount of assistance from IFT, they can all decline it. And many do. They all can work independently. And they do, even though they share common goals and coordinate on certain projects. Coordination of efforts and working toward common goals does not make three organizations one monolithic entity. It is almost like saying that the ABA and the Illinois State Bar Association and the Sangamon County Bar Association are all one and the same simply because they share common goals and they are interrelated. Do you dispute opposing counsel's representation that Mr. McHugh had to do things at the direction of the Illinois Federation of Teachers? It's written actually into the job description that part of the job was assisting AFT and IFT at conventions. It is true that IFT would give direction on we want to go organize here, we want to go organize there. But that's merely one fact that the board had to consider. We also have ample evidence in the record that this was a local job. The record from C200 to C205 has the job posting. This position involves extensive travel throughout Lake County on a daily basis. What are the duties? Organizing at all levels within the local. Coordination of new members local-wide. Expand ER&D classes county-wide. Other duties as assigned by the LCFT Executive Committee. And the job said this position is a full-time 12-month position working for the LCFT Executive Committee. So the fact that he coordinated with IFT on certain things is not dispositive. And the board had ample evidence in the record to conclude that they were separate organizations and he was not an IFT employee. Although Mr. McHugh identifies information from the website that the board considered, he doesn't explain how it hurt him. The board submits that most of it was cumulative. The information that did not appear in the Constitution and the bylaws was the fact that the LCFT is made up of 22 councils. And of those 22 councils, there are 5,500 members. And it's on the website that Mr. McHugh was the president of the LCFT. All that is information that of course would not be in the Constitution and the bylaws because it's subject to change. He has argued that there is nothing in the board's decision to indicate that it relied on the Constitution, the bylaws, and other materials in the record, rather than what it observed on the LCFT webpage. But in his reply brief, he cited to C-28 and 29 of the record. And that is the Claims Committee's recommended decision, which was adopted verbatim by the board. And on those pages, in addition to the website information, the committee was discussing the Constitution and the bylaws. That would seem to be a very strong indication, that discussion, that the board relied primarily on those materials and that its consideration of the webpage was incidental. And if it was error, it was harmless at best. Back to the equitable estoppel. It sounds like that would have stopped, might have stopped IFT. Why does it stop this person who is applying for a pension benefit? Is there something in the record that shows that the person that was hired for this position had knowledge of the structure, which you suggest was a facade? There were no specific credibility findings made by the board. We have the documentary evidence in the record from Mr. Smith, and that appears several times. Mr. McGeough testified that he intended to stay in whatever his pension was, but he testified that he didn't know what that language meant in that email. And he testified that it wasn't even on my radar screen, how I had to do that, whether it was through IFT, LCFT, AFT, it wasn't even on my radar screen. And the board would submit, for something this important, you would check. Someone would check. I mean, TRS is a toll-free number. They're perfectly happy to help anybody who might have questions about what their eligibility would be. There is no evidence in the record that anybody contacted TRS in the first instance to make sure that this arrangement and this job were TRS pension eligible. So that's something he would have been able to obtain an opinion on? Absolutely. There's a toll-free number. There's a website. There are a million ways to contact TRS, and they're helpful. That's the point. They're going to help people navigate the system. But they have to be asked to do it. Your Honor, there's a strong presumption that statutes are constitutional. The General Assembly is not required to define every term in a statute. And the pension code isn't vague just because the legislature declined to bloat it with definitions of ordinary, commonplace, easily understood words. Undefined terms are given their ordinary meaning. You can even go to the dictionary. And the pension code isn't constitutionally deficient because there isn't a definition of statewide. I mean, if there were a record snowstorm tonight throughout Sangamon County, and the city of Springfield decided to declare a citywide parking ban on the streets so that the plows could do their work, the board submits there isn't a person of reasonable, ordinary intelligence who would fail to understand that, no, you can't park on the streets in the city tonight, citywide. It's just that plain. And it's interesting, too, because for the LCFT coordinator position, the job posting uses terms like, well, you're going to do such and such countywide, and you're going to do such and such localwide. If these terms are so difficult to understand, why would they be in the job description, in the description of duties in the first place? Mr. McGee has argued the stipends he received were creditable income, and those were stipends he received as part of his vice president's duties for the Illinois Federation of Teachers, which was an unsalaried position. IFT itself has said that those payments were not compensation, and they were not creditable. They were given out for attendance at meetings. They look a lot like an expense allowance or a travel allowance pursuant to the code. And Mr. McGee has argued that, well, taxes were withheld from them. And while that was, again, one fact for the board to consider, for one thing, given other mistakes or misadvice that was given in this case, the board would not feel entirely comfortable concluding that those taxes were correctly and properly withheld. But again, it was merely one fact for the board to consider. The board also had explicit testimony and documentary evidence that those were not creditable earnings. And when there's more than one reasonable inference that could be drawn, the board cannot have committed error by selecting one of them. Unless the court has questions? I don't see any at this time. Then GRS and the board would stand on our briefs for the balance and urge that the board affirm the decision. Thank you. Roberto Counsel? And could we start out by, I want to ask you this question. With respect to the information you're saying the board relied upon that was not of record, is there anything in addition to what's contained in your brief, your opening brief on page 23 where you talk about that the LCFT has one primary governing body and the elected delegates from each of the 22 councils and bi-monthly meetings to set policy and direct the actions of the union, is there anything in addition to that that you're saying was improperly considered that was not of record? No, I don't believe so, Your Honor. Without reviewing it in the language specifically right now, whatever was contained in the website as cited by the board, that's the information we're talking about. So there were some block quotes, and I can certainly find that if Your Honor would like to split it up. But that was the information we were talking about. Counsel for TRS making assumptions as to what Glenn Smith's intentions were, what his motivations were. These were all items that were not in the record. She has no way of knowing what he intended or what he believed. Now the e-mail is in the record. The e-mails are, but to jump, to make an inference that I think I heard the word deceive, things like that, to jump and to make that assumption is simply not warranted here by the record. And to suggest that Mr. McGue, when told by the higher-ups and the IFT that he has a pension available to him, that he cannot rely on that and that he must now go and call a hotline to verify that, I think what Mr. McGue did was entirely reasonable in relying on the people who crafted this position, the IFT and the AFT higher-ups, who said that you have a pension available to you. So somehow try to put the, I'm sorry, I didn't mean that. No, I'm interrupting you. So TRS is responsible for his reliance on them? Well, I don't mean that, Your Honor. What I mean is to sit here and try to throw it back onto Mr. McGue, and that Mr. McGue should have foreseen this problem and he should have went and independently verified that. I don't think that's, Mr. McGue acted entirely reasonable in this instance here. And throughout the brief, from what I heard a little bit here today, there's a lot of attempt here to throw it back on Mr. McGue. And hindsight's always 20-20, I suppose. But Mr. McGue had a position offered to him with IFT benefits. It was based on the fact that IFT was a statewide organization. And then he contributed. And not only did he contribute his own portion of the payment to TRS, he also contributed the employer's portion, because that's how IFT works it. And so the school districts weren't funding any of this. Mr. McGue funded both the employer and the employee contributions. And he did this for 14 years. And he received statements, he received member statements, he received the custom benefits, and nobody said anything. And now to come back and try to say, well, this is Mr. McGue's fault. Mr. McGue, there's been an injustice here. There's been a fundamental unfairness here. And that Mr. McGue intended to retire. And he had an expectation after 33 years of work that it was his time to retire. And because of the fact that his 14 years was wiped away of the credit, he has been unable to do so. And so there's been some, in the briefs there was comments that, well, he's going back to work. Well, I would submit to your honors that when you're ready to retire after 33 years, going back to work, that doesn't make anybody feel better. And there's a damage here, because he expected to retire, and he wanted to retire, and he was entitled to retire, and he couldn't retire. And while he might be entitled, and we don't know what his contributions were, or what he's entitled to receive if there's a refund, the pension is much more valuable than what those contributions are. And to say, well, we're just going to refund the money to him, and whatever else he's entitled to, which we don't know because we've asked for that information, we've never been provided that information, then the pension is what he was paying for, and he's now not entitled to at least 14 years service credit for that. And there's a fundamental injustice when someone is ready to retire, and they're unable to retire, that there's an unfairness and an injustice here. And that's why we ask you to remedy that. Thank you very much.